01cv9000-zb-Knight.corr.wpd

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

|  |  |  |
|---|---|---|
|  | : | Case No. 1:01-CV-9000 |
|  | : |  |
| IN RE: SULZER HIP PROSTHESIS | : | (MDL Docket No. 1401) |
| AND KNEE PROSTHESIS | : |  |
| LIABILITY LITIGATION | : | JUDGE O'MALLEY |
|  | : |  |
|  | : | <u>MEMORANDUM AND ORDER</u> |
|  | : |  |
|  | : |  |

As this Court noted in a recent opinion, defendant Sulzer Orthopedics, Inc.[1] filed three similar motions, each asking the Court to enjoin the prosecution of a state court action brought by persons who are class-member plaintiffs in this Multi-District Litigation. The Court granted two of those motions, and reserved ruling on the third motion. *See* docket no. 2958 ("*Noel Order*").

The motion upon which the Court reserved ruling relates to the case of *Knight v. Sulzer Orthopedics, Inc.*, case no. BC-253689, Superior Court of the State of California, Los Angeles Cty. The Court now addresses this motion and, for the reasons stated below, Sulzer's motion to enjoin the prosecution of this case (docket no. 2797) is **GRANTED**. The Court **ORDERS** that counsel for the Knights shall: (1) immediately transmit a copy of this Order to (a) their clients, and (b) the relevant state court; and (2) thereafter submit to this Court a letter confirming compliance with this provision.

---

[1] Sulzer Orthopedics, Inc. was later renamed Centerpulse Orthopedics, Inc., and then purchased by Zimmer Holdings, Inc. The Court refers to the defendant as "Sulzer."

Finally, in Section II of this Order, the Court sets out an observation about additional proceedings that the Knights may choose to pursue in this case.

**I. The Knight's Individual Circumstances.**

The Court set out the general background of this case, and the prior rulings and Settlement Agreement provisions relevant to Sulzer's motion, in the *Noel Order*; the Court incorporates here that entire discussion by reference. When these legal precepts are applied to the particular circumstances of the *Knight* case, the Court concludes that Sulzer's motion must be granted.

Plaintiff class members Valerie and Adam Knight aver as follows. Mr. Knight is in the surgical equipment business and had a personal relationship with Sulzer sales agent Rich Cadarette. On March 8, 2000, Valerie received surgical implantation of a Sulzer Inter-Op Shell; prior to implantation, Adam mentioned the surgery to Cadarette. After the surgery, Valerie began to have pain, and Adam discussed this with Cadarette. At first, Cadarette assured Adam that there was no problem, and Valerie's symptoms were normal; in late 2000, however, Cadarette told Adam that Valerie's implant was defective and a recall would soon occur. In fact, Sulzer did issue a recall in December of 2000. Cadarette also told Adam that Valerie should wait to have revision surgery until January of 2001, because Sulzer was going to make available "new, super clean shells." Valerie followed Cadarette's advice and replaced her original implant with another Sulzer implant on January 17, 2001.

As it turns out, however, Valerie's new implanted shell was actually a Reprocessed Inter-Op Shell. Valerie began to experience pain again, and in July of 2003 her symptoms progressed to the point that they mirrored her previous experience, just before her earlier revision surgery. Adam

contacted Cadarette again to ask about Valerie's symptoms; on August 28, 2003, Cadarette stated that Valerie's second implant was actually a Reprocessed Shell. Valerie eventually had this second shell removed and replaced on December 2, 2003. During this second revision surgery, Valerie's pelvis fractured and she suffered permanent physical damage.

Due, in part, to Adam's personal relationship with Cadarette, the Knights were aware of the pendency of this MDL and the Court's approval of the Settlement Agreement. Valerie received actual, mailed notice of the Settlement Agreement and was aware of her opportunity to opt out by May 15, 2002. Critically, this deadline came after Valerie's first revision surgery, but before her second revision surgery. This means that Valerie's choice of whether to opt out of the Settlement Agreement was premised on her then-current belief that she had received only one defective implant; she now claims that this belief, in turn, was premised on Cadarette's assurance that her original implant had been replaced with a "new, super clean shell." In fact, however, the Final Notice of Settlement received by Valerie revealed that Cadarette's assurance was false; the Notice explained that some of the affected products were "Reprocessed" shells, and the list of affected products included Valerie's replacement implant.

In any event, Valerie chose not to opt out, and in August of 2002 she submitted a claim for benefits related to her first surgery. With her claim forms, Valerie also signed the Release and Covenant Not to Sue. The Claims Administrator found her claim well-taken and Valerie received

payment of APRS benefits.[2]

The Settlement Agreement provides that Valerie had 180 days from her second revision surgery – that is, until May 30, 2004 – to file a second claim for benefits. Had she filed a valid second claim, Valerie might have been eligible for Reprocessed Shell APRS benefits, as well as Extraordinary Injury Fund ("EIF") benefits. These benefits were potentially substantial – as much as $160,000 in benefits for Reprocessed Shell APRS, and $800,000 for EIF benefits, plus a subsidy of her attorney's contingent fee of up to $276,000. Valerie, however, did not file a second claim; rather, on August 23, 2004, the Knights filed a lawsuit against Sulzer in California state court. This lawsuit asserts 14 claims, premised on various theories of fraud, negligence, strict products liability, and breach of warranty. Sulzer insists that the Knights must be enjoined from prosecuting this lawsuit.

The Knights do not dispute that: (1) they are class members; (2) they did not opt out of the Settlement Agreement; (3) they covenanted not to sue Sulzer when they filed their claims for Settlement benefits related to Valerie's first APRS; (4) this Court previously and permanently enjoined them from continuing to prosecute their claims against Sulzer or related defendants "in any federal or State court;" or that (5) this Court continues to have jurisdiction over them and their claims against Sulzer. The Knights argue, however, that these facts do not preclude their present lawsuit, at least as to their fraud claims. They explain:

---

[2] More specifically, the Claims Administrator determined Valerie was eligible for an award of $160,000 as an APRS benefit, and a separate award of $46,000 as an attorney fee subsidy benefit. The attorney fee benefit was paid in two checks payable to Valerie's attorney (Dimitrios P. Biller, of Pillsbury Winthrop, LLP in Los Angeles, California), in the amounts of $37,375 and $8,625. The APRS benefit was paid in three checks, in the amounts of $40,000, $90,000, and $30,000. Of all these checks, only the first check for attorney's fees has been cashed. The Knights are apparently represented in their state court action by different counsel.

4

> [Valerie's original] acceptance of the terms of the Settlement Agreement and her decision to not opt out with respect to her [second] implantation [of] what was later to be revealed as an affected Reprocessed Inter-Op Shell on January 17, 2001 was fraudulently induced by the willful misrepresentation of Sulzer, by and through its agent Richard Cadarette. The Settlement Agreement, therefore, is voidable as to [Valerie's] claims arising from her January 2001 revision surgery.
>
> The Settlement Agreement does not apply to [Valerie's] current causes of action against defendant Sulzer for fraud. Defendant, through its agent Cadarette, who had authority to speak on behalf of Sulzer, concealed and misrepresented the nature of the [Reprocessed Shell] prior to, during and after [Valerie's second] revision surgery and thereby fraudulently induced [Valerie] to 1) go through surgery with another defective Sulzer implant; and 2) refrain from opting out of the class settlement. **At no time prior to the opt out date of May 15, 2002 was [Valerie] aware that the class settlement applied to the [Reprocessed Shell] implanted in her during the first revision surgery on January 17, 2001.**

Response at 6 (emphasis added). Essentially, the Knights assert they would have opted out had they known Valerie's second implant was a Reprocessed Shell, and not a "new, super clean shell."

There are a number of problems with this argument. First, the assertion quoted above rendered in bold is belied by the facts. Regardless of what Cadarette told the Knights about the qualities of Valerie's replacement Inter-Op Shell, the Knights knew that: (1) there was such a thing as "Reprocessed Inter-Op Shells," and the Settlement Agreement provided benefits to recipients of these Shells; and (2) to determine with certainty whether Valerie had ever been implanted with an affected product, including both her original and replacement shells, they had to check whether her product lot number(s) were included on the list of "Affected Products." The Final Notice of Settlement, for example, which Valerie admits she received, explained:

> **WHAT IS THE SULZER HIP PROSTHESIS AND KNEE PROSTHESIS PRODUCT LIABILITY LITIGATION ABOUT?**
> **Inter-Op™ Acetabular Shell and Reprocessed Inter-Op™ Shells ("HIP Implants").**
>
> Sulzer designs, manufactures and distributes orthopedic implants for hips, knees, shoulders, and elbows. One of its products is known as the Inter-Op™ Acetabular Shell (otherwise referred to herein as an Inter-Op™ Shell). Sulzer also

5

>  distributed Reprocessed Inter-Op™ Shells that have undergone additional manufacturing reprocessing.
>  
>  A manufacturing defect prevented some of Sulzer's Inter-Op™ Shells and Reprocessed Inter-Op™ Shells from functioning properly.
>
> * * *
>
> **HOW DO I KNOW IF I WAS IMPLANTED WITH AN AFFECTED PRODUCT?**
> You were implanted with an Affected Product, if:
> (1)  You were implanted with an Inter-Op™ Acetabular Shell or a Natural Knee® II Tibial Baseplate identified on Exhibit I; or
> (2)  You were implanted with a Reprocessed Inter-Op™ Shell identified on Exhibit II.
>
> If you are unsure whether you were implanted with an Affected Product, and you have previously hired your own counsel, you are encouraged to contact him/her. If you do not have your own counsel, you are encouraged to contact the Claims Administrator or Plaintiffs' Liaison Class Counsel.

Final Notice at 3, 5. Thus, regardless of whatever statements Cadarette may have made to the Knights in December of 2000 about the "super clean" quality of Valerie's replacement Inter-Op Shell: (1) the Knights knew as of the opt-out date that Valerie had been implanted with a second Sulzer Shell; and (2) the Final Notice apprised them that this replacement Shell was, in fact, an Affected Product. It is not true, as Valerie asserts, that she had no reason to know, prior to the opt out date of May 15, 2002, that the Settlement Agreement applied to the Reprocessed Shell implanted in her during the first revision surgery.

Second, the Release and Covenant Not to Sue, which the Knights signed, explained what legal rights the Knights were relinquishing in exchange for receipt of any settlement benefits. This Release conditioned any receipt of benefits on the Knights' agreement that they:

> fully, finally, and forever settle and release any and all Settled Claims, including assigned claims, *whether known or unknown, asserted or unasserted, regardless of the legal theory, existing now or arising in the future* out of or relating to the purchase, use, manufacture, sale, distribution, promotion, marketing, clinical

6

> investigation, administration, regulatory approval, and labeling of an Affected Product that I may have against any Released Party.

*See* docket no. 243, exhibit 8 at 10 ("Orange Form") (emphasis added). With the same release, each of the Knights also agreed with the following statement: "I am aware that I may discover claims presently unknown or unsuspected or facts in addition to or different from those which I now believe to be true with respect to the matters released herein which may be applicable to this Settlement." *Id.* And "Released Parties" included "sales agents," as well as "distributors of Affected Products, and any other person or entity involved in the design, manufacture, distribution, implant or explant of an Affected Product." Settlement Agreement at §1.1(ttt)(v).

It is true that Valerie signed this release in 2002, but did not learn she would need a second revision surgery until 2003. But Valerie knew, when she signed the release, that she had a Sulzer Shell implanted in her hip; and the Final Notice, which she received *before* she signed the release, informed her of the *possibility* of a future need for another revision surgery due to product defect – that is, the Final Notice listed all Affected Products, including her second implanted Shell. There can be no doubt that the release language encompasses a claim against Sulzer or Cadarette stemming from implantation of Valerie's Affected Reprocessed Inter-Op Shell.

Finally, it is critical to note that Valerie received *actual notice* that her second implant was an Affected Reprocessed Inter-Op Shell. Adam avers that, on August 28, 2003, Cadarette told him that the "super clean shell" Valerie had received was actually a Reprocessed Shell. The Knights do not argue that Cadarette or Sulzer took any action preventing their timely submission of a second claim for benefits related to Valerie's second APRS. Despite having until May 30, 2004 to do so, however, the Knights chose not to submit a second claim, affirmatively forgoing the potential for over

7

$1 million in additional benefits from the Settlement Trust. Having missed the deadline, the Knights now argue that the Settlement Agreement should apply to them regarding Valerie's first APRS, but not her second APRS.[3] There is no support for this argument in light of the terms of the Settlement Agreement itself, the Knights' undisputed status as class members, the Release signed by the Knights, and the Court's earlier Orders.

In sum, the Knights are bound by the Settlement Agreement, which applies to Valerie's implantation of both of her Affected Products. Accordingly, Sulzer's motion to enjoin the Knights' prosecution of his claims in California state court must be **granted**.[4]

**II. CAP 29.**

Although the Court enjoins the continued prosecution by the Knights of their claims in state court, the Court adds the following observation. Claims Administration Protocol ("CAP") 29 states that "the Claims Administrator may grant a Class Member an extension of time in which to submit a Claim or other document required by the Settlement Agreement or applicable CAP." CAP 29, ¶3. Circumstances that give rise to a permissible extension of time include, but are not limited to,

---

[3] For example, with reference to their claim of fraudulent inducement, the Knights assert that "[t]he Settlement Agreement . . . is voidable [only] as to [Valerie's] claims arising from her January 2001 revision surgery." Response at 6.

[4] While this Court does not intend to judge the merits of the fraud claims the Knights assert in their California case, it is worth noting there are certain weaknesses in the allegations that the Knights recite to support those claims. The Knights do not allege they purchased Valerie's implant directly from Cadarette, nor even that Cadarette made statements to, or influenced in any way, Valerie's surgeon. The Knights also do not allege Cadarette had a fiduciary relationship with them. The Knights simply assert that Adam Knight and Cadarette were business acquaintances and that, in that context, Cadarette made comments to Knight about the Sulzer products that Valerie's doctor chose to use with Valerie. These are relatively weak allegations upon which to premise a fraud claim.

"misrepresentation, or other misconduct of some party other than the Class Member or his or her counsel." *Id.* ¶4(c); *see also id.* ¶8 (vesting the Claims Administrator with discretion to allow for extensions of time for other reasons); ¶6(c) (noting that, in other circumstances, extensions of time may be appropriate if the claimant was "materially misled by some person in a position of authority"). While the Court has concluded that the Knights cannot pursue in state court the claims asserted in their complaint, the allegations supporting those claims may arguably support an assertion that a CAP 29 extension of time remains appropriate, because of misrepresentations or misleading statements made by Sulzer's agent, Cadarette, to the Knights.

Of course, whether such an argument is well-taken, when viewed in the context of (1) all of the facts of the Knights' case, and also (2) the entire constellation of claims made by other class members, is entirely up to the Claims Administrator; and the Court has no opinion on this question. The Court merely observes here that, unlike the other claimants recently enjoined by the Court in the *Noel Order*, the Knights have not actually made a claim for and been denied benefits related to Valerie's second APRS.  Thus, CAP 29 may become relevant if the Knights choose to pursue this option.

**IT IS SO ORDERED.**

                                                  <u>s/Kathleen M. O'Malley</u>
                                                  **KATHLEEN McDONALD O'MALLEY**
                                                  **UNITED STATES DISTRICT JUDGE**

DATED:  September 27, 2005