\\clesto\user\huthcm\Wptext\WPDOCS\01-9000-Kuhn-Jacks.ord.wpd

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

|  |  |  |
|---|---|---|
| | : | **Case No. 1:01-CV-9000** |
| | : | |
| **IN RE: SULZER HIP PROSTHESIS** | : | **(MDL Docket No. 1401)** |
| **AND KNEE PROSTHESIS** | : | |
| **LIABILITY LITIGATION** | : | **JUDGE O'MALLEY** |
| | : | |
| | : | **MEMORANDUM AND ORDER** |
| | : | |
| | : | |

On July 25, 2005, defendant Sulzer Orthopedics, Inc.[1] filed an emergency motion, seeking to enjoin class member Susan Kuhn from pursuing certain discovery in a Texas state court malpractice action she has brought against her former attorney, Tommy Jacks.  The Court granted the motion by entering a temporary injunction, *see* docket no. 2961 ("*Kuhn Injunction Order*"), and scheduled a hearing on August 17, 2005 to determine the propriety of continuing the injunctive relief.  Before the hearing, attorney Jacks also filed a motion for injunctive relief and to enforce the Settlement Agreement between Kuhn and Sulzer (docket no. 2966), essentially asking for the same relief as had Sulzer in its emergency motion.  In addition, Kuhn filed a motion for reconsideration of the *Kuhn Injunction Order* and for a declaration of her rights under the Settlement Agreement (docket nos. 2970, 3015).  Sulzer, Jacks, and Kuhn each filed a number

---

[1]  Sulzer Orthopedics, Inc. was later renamed Centerpulse Orthopedics, Inc., and then purchased by Zimmer Holdings, Inc.  The Court refers to the defendant as "Sulzer."

of briefs before the Court's August 17, 2005 hearing, and Jacks and Kuhn each filed post-hearing briefs.

Having reviewed all of the materials and arguments submitted by the parties, the Court now rules as follows. For the reasons and to the extent stated below, Sulzer's motion for permanent injunctive relief is **GRANTED**; Jacks' motion for permanent injunctive relief is **GRANTED**; and Kuhn's motion for reconsideration is **DENIED**. Kuhn's motions for declaration of rights are **GRANTED**, to the extent that this Order sets out the limits of permissible discovery in Kuhn's Texas malpractice action.

## I. General Background.

The Court has set out the history of this case several times before, *see In re: Sulzer Hip Prosthesis and Knee Prosthesis Liab. Litig.*, 268 F.Supp.2d 907, 910-20 (N.D. Ohio 2003), *affirmed*, 398 F.3d 778 (6th Cir. 2005), so the Court recapitulates here only critical highlights.

In early December of 2000, Sulzer announced a voluntary recall of certain manufacturing lots of its Inter-Op Shell hip implants, due to a possible defect. Shortly thereafter, significant litigation ensued, eventually leading to creation of the instant Multi-District Litigation ("MDL"). The undersigned has presided over the Sulzer MDL since its inception on June 19, 2001.

On August 29, 2001, the Court provisionally certified a class of all U.S. citizens or residents who had been implanted with affected Inter-Op Shells. The Court also granted preliminary approval to a proposed Initial Settlement Agreement. Thereafter, the parties engaged in substantial discovery and further negotiations. On March 12, 2002, the parties jointly submitted a proposed Final Settlement Agreement. Unlike the Initial Settlement Agreement, which addressed only recipients of allegedly defective Sulzer Inter-Op Shell hip implants, the Final Settlement Agreement also included recipients of: (1) allegedly defective

*Reprocessed* Inter-Op Shell hip implants (that is, recalled Inter-Op Shells that were re-cleaned and then re-sold) and (2) allegedly defective Natural Knee II Tibial Baseplate knee implants.

The Court preliminarily approved this Final Settlement Agreement as fair. *See* docket no. 232.[2] The Court also approved a joint plan for giving notice of the terms of the Settlement Agreement to the entire plaintiff class. *See* docket no. 216 ("*Notice Order*"). On May 6-7, 2002, after this notice to the class had been given, the Court held an extensive "final fairness hearing" to determine: (1) the fairness, reasonableness, and adequacy of the Final Settlement Agreement; (2) the propriety of final class certification; and (3) the propriety of granting final approval of the Settlement Agreement. The Court heard from several expert witnesses, counsel for plaintiffs, and counsel for defendants, and also received communication directly from class members and other interested parties. On May 8, 2002, the Court certified the Settlement Class and granted final approval of the Settlement Agreement. On June 4, 2002, the Settlement Agreement became irrevocable and the Court entered an Order confirming its May 8, 2002 Order and dismissing all Settled Claims with prejudice. *See* docket no. 353 ("*Injunction Order*").[3] The Settlement Agreement, *Final Approval Order*, and *Injunction Order* all contain provisions that control the Court's rulings on Sulzer's, Jacks' and Kuhn's pending motions.

First, the *Final Approval Order* provided that class members who wanted to opt out of the settlement had until May 15, 2002 to do so. As the Final Notice to class members made clear, if a class member *failed* timely to opt out of the Settlement Agreement, then she was automatically subject to all of

---

[2] The Settlement Agreement, as amended, is available at sulzerimplantsettlement.com/classactionsettlement.htm.

[3] The *Injunction Order* is available at *In re: Inter-Op Hip Prosthesis Product Liab. Litig.*, 2002 WL 31472685 (N.D. Ohio June 4, 2002).

its terms. *See* docket no. 243, exhibit 2 at 14 (Final Form of Notice of Settlement) ("If you do not Opt-Out (exclude yourself from the Settlement), you will be bound by the Settlement. You will not be able to pursue any Settled Claims.").

The Settlement Agreement, in turn, provided that claimants could receive various types of benefits, depending upon the medical complications they suffered stemming from their defective implant(s). Two examples of benefits available under the Settlement Agreement were: (1) Affected Product Revision Surgery ("APRS") benefits, and (2) Extraordinary Injury Fund ("EIF") benefits. As a general matter, APRS benefits were payable to claimants who had to obtain revision surgery to have an Inter-Op Shell hip implant removed; the amount of APRS benefits payable was usually $160,000. *See* Settlement Agreement §3.4. As for EIF benefits, the Settlement Agreement set out a matrix of amounts payable to claimants who suffered any of a range of complications related to the defective implant, such as permanent loss of physical function, or death during revision surgery. *See* Settlement Agreement §3.7 & Annex IV. A total award of EIF benefits to an individual claimant could be as high as $800,000. Claims Administrator Procedure ("CAP") 32, ¶4.

An additional category of benefits available under the Settlement Agreement was payment of a portion of a class member's contingent attorney fees. As the Final Notice explained, if a claimant had entered into a contingent fee agreement with an attorney, the claimant could be eligible to receive partial payment of her contingent attorney fees in the amount of 23% x 1.25 x the injury benefits received. As an example, a claimant who received APRS benefits of $160,000 might also be eligible to receive a contingent attorney fee benefit equal to $46,000. The claimant's attorney could then choose to accept this attorney fee benefit as full payment, or instead to insist on the full contingent amount. *See* docket no. 243, exhibit

4

2 at 8-9 (Final Form of Notice of Settlement explaining payment of attorney contingent fees); *see also*

Settlement Agreement §§3.4(a), 3.7(a).[4]

A third benefit provided to class members under the Settlement Agreement was their receipt of the

benefit of efforts by attorneys who worked, without direct compensation, on behalf of the entire class.  As

the Final Notice explained:

> Attorneys from across the country have been involved in the prosecution of the case and the negotiation of the Settlement on behalf of the Class.  A number of difficult issues were involved in the litigation and negotiation of the Settlement.  The most difficult issues involved the responsibility of Sulzer Ltd. for the alleged manufacturing defects of the Affected Products and the existence of insurance coverage.  Under the prior Settlement, Sulzer Ltd. was not contributing any cash or stock to the Settlement, and Winterthur Insurance Company had not committed to making payments into the Settlement. However, through the efforts of Counsel, Sulzer Ltd. and Winterthur have agreed to contribute substantial payments to the Settlement.

Notice at 15.  In fact, even though both Sulzer Ltd. and Winterthur had "potent" defenses, various plaintiffs'

counsel "obtained a settlement commitment from Sulzer AG of $50 million in cash and over 480,000 shares

---

[4]  The following explanation was set out in the Final Form of Notice of Settlement, which Kuhn received:

> As a benefit to the Class Member, the Settlement Trust shall pay a portion of the Class Member's attorney fees.  This contribution to the attorney fees shall be equal to 23% of the stated benefit x 1.25.
>
> *Example: If the stated benefit under the Affected Product Revision Surgery Fund is $160,000 and the contingency contract rate is 33a% then the fee calculation will be as follows:*
>
> *23% of $160,000 x 1.25 = $46,000*
>
> NOTE: This payment towards a Class Member's attorney fees shall be a set off from, not an addition to, the amount of attorney fees owed by the Class Member.  Therefore, under the above example, the Class Member's attorney, after receiving the fee payment benefit under the settlement, will be entitled to collect up to $20,666 [i.e., {33a% of $160,000 x 1.25 =} $66,666 – $46,000].

Notice at 9.  For a full discussion of proper contingent attorney fee calculations under the Settlement Agreement, see docket no. 620.

of Sulzer Medica stock [worth over $50 million]," and "obtained a commitment from Winterthur to provide

a total of over $215 million toward the settlement." *In re: Sulzer Hip Prosthesis and Knee Prosthesis

Liab. Litig.*, 268 F.Supp.2d 907, 917 (N.D. Ohio 2003).

The Final Notice disclosed that, to compensate these attorneys for their provision of a "common

benefit" to the entire class, $50 million in potential "common benefit attorney fees" had been set aside.

Notice at 15. "Class Counsel and individual plaintiff's counsel that did work for the benefit of the Class

may apply to the Court for an award of attorney fees and expenses from this fund. These attorney fees will

not reduce any benefits provided to Class Members under the Settlement." *Id.* The Settlement Agreement

further explained that an attorney who believed he was entitled to a common benefit attorney fee award

"shall first make an application to the Court." Settlement Agreement §5.5. The Court would then "review

all such applications and make a determination" with respect to each attorney. *Id.* On June 12, 2003 –

over a year after the Settlement Agreement became irrevocable – the Court entered its common benefit

attorney fee awards. The Court awarded Jacks a common benefit attorney fee award of $2.7 million.

Various appeals were taken from the Court's attorney fee awards. The Sixth Circuit Court of Appeals

affirmed this Court's fee awards in all respects, finding them reasonable and appropriate in the

circumstances. *In re: Sulzer Hip Prosthesis and Knee Prosthesis Liab. Litig.*, 268 F.Supp.2d 907

(N.D. Ohio 2003), *affirmed*, 398 F.3d 778 (6th Cir. 2005).

To obtain the benefits described above, the Settlement Agreement provided that the claimant class

member had to meet certain deadlines. For example, with regard to a class member seeking APRS

benefits, the Settlement Agreement provided that the last possible date for a claimant to file the required

claim forms to request APRS benefits was December 2, 2003. *See* Settlement Agreement §4.2(a). The

6

Settlement Agreement set similar deadlines for filing claim forms to request EIF benefits.  *Id.* §4.3(a).

The *Injunction Order* and the Settlement Agreement also made clear that, by entering into the Settlement Agreement and accepting the benefits it provided, a class member was also agreeing to forego certain rights and submit to certain other terms.  Primarily, the Settlement Agreement explained its own effect on the plaintiffs' pending lawsuits: "every Settled Claim of each Class Member (other than a Class Member who exercises an Opt-Out Right pursuant to Section 3.8) shall be conclusively compromised, settled and released."  *Id.* §7.2.  Simply, any class member plaintiff who did not opt out of the Settlement Agreement thereby traded irrevocably her legal claims (as defined in the Agreement) against the defendants for the opportunity to obtain stated benefits under the Settlement Agreement.

Further, the *Injunction Order* made clear that this Court retained continuing and exclusive jurisdiction over all participating plaintiff class members regarding any claims related to their Sulzer implants: this "Court **RESERVES** continuing and exclusive jurisdiction over the Parties, including Sulzer, Sulzer AG, and the Class Members (other than a Class Member who [exercised] an Opt-Out Right pursuant to Section 3.8 of the Settlement Agreement), to administer, supervise, interpret, and enforce the Settlement Agreement in accordance with its terms, and to supervise the operation of the Sulzer Settlement Trust." *Id.* at 3 (emphasis in original).  *See also* Settlement Agreement at §9.1 (same, and further noting the Court's continuing jurisdiction "to interpret and enforce the terms, conditions and obligations of this Settlement Agreement"); *id.* §13.3(6) (same).

Finally, the Settlement Agreement also made clear that neither the Agreement itself, nor the negotiations leading up to the Agreement, were admissible for any purpose in any other judicial proceeding. Specifically, the Settlement Agreement contained the following provision:

7

The Parties to the Settlement, including Sulzer, Sulzer AG, the other Released Parties, or any Class Member, shall not seek to introduce and/or offer the terms of the Settlement Agreement, any statement, transaction or proceeding in connection with the negotiation, execution or implementation of this Settlement Agreement, any statements in the Notice documents delivered in connection with this Settlement Agreement, stipulations, agreements, or admissions made or entered into in connection with the fairness hearing or any finding of fact or conclusion of law made by the Trial Court, or otherwise rely on the terms of this Settlement Agreement, in any judicial proceeding, except insofar as it is necessary to enforce the terms of the Settlement Agreement (or in connection with the determination of any income tax liability of a Party).  If a Class Member who is not entitled to benefits hereunder seeks to introduce and/or offer any of the matters described herein in any proceeding, the restrictions of this Section 15.3 shall not be applicable to Sulzer, Sulzer AG and the other Released Parties with respect to that Class Member.

Settlement Agreement ¶15.3.

## II. Background of *Kuhn v. Jacks*.

On October 4, 2000 at the age of 35, Susan Kuhn was implanted with an Inter-Op Shell hip implant.  This was shortly before Sulzer announced its recall of certain manufacturing lots of its Inter-Op Shells in December of 2000.  Because her implant failed, Kuhn underwent revision surgery; unfortunately, Kuhn's replacement implant was one of Sulzer's Reprocessed Inter-Op Shells, and this replacement implant also failed.  On July 3, 2001, Kuhn had a second revision surgery to replace the Reprocessed Inter-Op Shell.  As a result of these surgeries, Kuhn has been left with permanent injuries, including acetabular bone loss, abductor weakness, and gait alteration.

In February of 2001, Kuhn retained attorney Buddy Bell to represent her in a lawsuit against Sulzer.  Bell then referred the matter to attorney Tommy Jacks.  After Kuhn chose not to opt out of the Settlement Agreement, Jacks acted on behalf of Kuhn to file claim forms requesting APRS benefits related to both of Kuhn's revision surgeries.  The Claims Administrator concluded that the claim for APRS benefits

8

was valid and paid Kuhn APRS benefits of $320,000 (representing a payment of $160,000 for each APRS surgery).  The Claims Administrator also concluded that Kuhn was entitled to a contingent attorney fee benefit of $92,000 (( representing a contingent fee of $46,000 for each APRS surgery payment).  Bell and Jacks accepted this amount as full payment of their attorney fees, although the agreement between Bell and Kuhn entitled the attorneys to more.[5]

Because Kuhn's youth was unusual among class members, and because she had suffered permanent injuries, she and Jacks believed she was probably also entitled to EIF benefits.  Again, Jacks acted on behalf of Kuhn to file claim forms requesting EIF benefits.  Specifically, Kuhn requested: (1) Matrix IV benefits for hip abductor weakness leading to gait alteration; (2) Matrix V benefits for hip abductor weakness leading to gait alteration; (3) Matrix V benefits for acetabular bone loss; and (4) Matrix IX benefits for severe emotional distress and increased child care expense.

The relevant provision of the Settlement Agreement stated that the deadline for submission of Kuhn's claim for EIF benefits was "five hundred and forty-five (545) days from the date of the applicable Covered Revision Surgery."  Settlement Agreement §4.3(a).  Given that Kuhn's second revision surgery occurred on July 3, 2001, Kuhn's deadline for filing an EIF benefits claim form was December 30, 2002.  Jacks did not submit Kuhn's EIF benefit claim form, however, until January 23, 2003.  The Claims Administrator concluded that Kuhn's four-part claim for EIF benefits must be denied in its entirety, because

---

[5] In fact, for all of the many claimants he represented, Jacks agreed to accept as full payment the contingent attorney fee benefits payable under the Settlement Agreement, and forego collection of additional contingent fees he was entitled to receive under applicable fee agreements.  By following this policy, Jacks' total foregone contingent fees totaled over $1.65 million.  *See* docket no. 738, attachment 1 (common benefit attorney fee award chart).

Kuhn had missed the deadline.  The Claims Administrator further concluded that, had Kuhn's claim been timely, only one of her four separate claims for EIF benefits was valid on the merits, being the claim for Matrix V benefits for hip abductor weakness leading to gait alteration.[6]  The amount of EIF benefits payable to Kuhn under Matrix V would have been $160,000.  Settlement Agreement Annex IV at 3-4; CAP 27 at ¶9(e).[7]  Kuhn appealed the Claims Administrator's denial of her EIF claims, but the denial was upheld by the Special Master.

After her EIF benefits claim was denied, Kuhn filed a legal malpractice lawsuit against Bell and Jacks in Texas state court.  When first filed, Kuhn's malpractice lawsuit was a simple negligence action for failure to timely file her claim for EIF benefits.  After Kuhn learned this Court had entered a $2.7 million common benefit attorney fee award to Jacks, however, Kuhn amended her Texas lawsuit to add claims for fraud, misrepresentation, breach of fiduciary duty, and violation of the Texas Deceptive Trade Practices Act; she seeks damages in excess of $10 million.[8]

---

[6]  *See* docket no. 2983, exh. 1(H) (letter from Claims Administrator to Jacks).  The Claims Administrator apparently made findings on the merits in case the Special Master reversed the denial of the claim on the grounds of timeliness.  The letter explains that the Matrix V claim for pain and disability was "denied as untimely, but is otherwise complete and would have been compensable had it been timely submitted," while the other three claims were "not only untimely, but . . . also failed due to another substantive deficiency."  The final determination itself identified these substantive deficiencies as insufficient evidence of claimed injury and failure to meet the injury qualifications described in the relevant CAPs.

[7]  Because she did not require a wheelchair or undergo amputation, Kuhn is deemed to have suffered a moderate injury, not a severe injury.  CAP 27 at ¶9(e).  The maximum benefit payable to a claimant younger than 40 years old for a moderate Matrix V injury is $160,000.  Settlement Agreement Annex IV at 3-4.

[8]  Kuhn has stated she seeks, among other amounts, forfeiture by Jacks of the $2.7 million common benefit fee award he received, as well as all contingent attorney fee benefit amounts he received in connection with *all* claimants whom he represented (not just Kuhn).

In pursuit of her Texas lawsuit, Kuhn served a subpoena on Sulzer seeking, among other things, the names of all persons who had opted out of the Settlement Agreement, information about lawsuits these persons had pursued against Sulzer, and any settlements (confidential or otherwise) Sulzer had reached with them. Kuhn also sought Sulzer's analysis of how these opt-outs affected its decision to accept the final Settlement Agreement. Kuhn believed this information was relevant to her malpractice action because she believed it would show that Jacks misrepresented to her the likelihood that Sulzer would file bankruptcy if too many class members opted out, and misrepresented to her the superiority of accepting the Settlement Agreement. Kuhn also believed this information would show that, had she opted out and sued Sulzer instead, she would have been able to actually *collect* a judgement or settlement against Sulzer.

Sulzer objected to Kuhn's subpoena, arguing (among other things) that §15.3 of the Settlement Agreement explicitly precluded Kuhn from seeking the subpoenaed documents, and that this Court had exclusive jurisdiction to administer and interpret §15.3. Kuhn filed a motion to compel with the Texas state court. At a hearing on this motion in Texas, Kuhn took "the position that the [Settlement Agreement] is not binding on us because we were fraudulently induced into entering it." Tr. at 13. Kuhn further argued that Jacks had a conflict of interest, breached his fiduciary duty to her, and committed fraud, all so that he could obtain the $2.7 million settlement "bonus" from Sulzer, which Kuhn knew nothing about. Kuhn asserted the subpoenaed documents were necessary to prove these "bad *mens rea*" claims. The Texas court ultimately granted Kuhn's motion in part and ordered Sulzer to produce the requested documents related to the opt-outs who were from Texas. Sulzer chose to comply with the Texas state court's order.

Thereafter, Kuhn issued additional subpoenae, seeking to delve more deeply into the analysis Sulzer pursued when deciding whether to enter into the Settlement Agreement. First, Kuhn served a Texas

11

subpoena on Sulzer's counsel, Shook, Hardy, and Bacon ("SHB"), seeking information relating to: (1) all discussions and negotiations Sulzer had with any party related to any "attorney fee" provisions contained in the Settlement Agreement, and (2) all discussions and negotiations Sulzer had with Jacks regarding any issue connected with the MDL. Kuhn then served a similar subpoena on Sulzer directly. Sulzer attempted to quash these subpoenae, but Kuhn filed a motion to compel, motion for sanctions, and request for emergency hearing. The Texas court granted the motion for emergency hearing, at which Kuhn then made more clear the supposed facts supporting her theories against Jacks: "there was $50 million paid by Sulzer to certain key plaintiffs' lawyers to swing the deal. Mr. Jacks got 2.7 million of this $50 million slush fund. * * *  What went between [Jacks] and Sulzer to create this special $2.7 million?" Tr. at 32.[9]  Kuhn explained that she wanted Sulzer board minutes reflecting Sulzer's settlement discussions because "I can't believe that the board of directors didn't know about the $50 million. * * * [I]t would lead us to be able to show that the negotiations that were going on resulted in the $50 million being given to these key lawyers who were instrumental in putting this together. * * * The fix was in, if I can use that phrase." Tr. at 37. Again, the Texas court granted, in large part, Kuhn's motion to compel.

In response, Sulzer sought help from this Court, filing an emergency motion to enjoin Kuhn from seeking and obtaining the requested discovery. Following a telephone conference with counsel for Sulzer and Kuhn, the Court granted the motion and enjoined Kuhn from, inter alia, "taking any action to require that Sulzer provide testimony or evidence regarding any negotiations and/or discussions that led to the Final Settlement Agreement." *Kuhn Injunction Order* at 2.

---

[9]  Although it is obvious, the Court makes clear here that it was not actually Kuhn, but her counsel, who made these provocative statements.

Before the Court entered the *Kuhn Injunction Order*, Kuhn had scheduled Jacks' deposition in the Texas case. Jacks suggested the deposition be postponed pending this Court's August 17, 2005 hearing, but Kuhn declined. At that deposition, Kuhn asked Jacks questions regarding the negotiation of the common benefit attorney fee provisions contained in the Settlement Agreement. Although the wording of the *Kuhn Injunction Order* enjoined Kuhn from requiring only *Sulzer* to provide testimony related to Settlement Agreement negotiations, Jacks refused to respond to these questions, believing the *Kuhn Injunction Order* allowed and required *him* to refuse, as well. Jacks then filed his pending motion for injunctive relief, which essentially seeks to extend the Court's preclusion of inquiry by Kuhn to cover all persons, and not just Sulzer.

### III. Analysis.

As a starting point, the Court easily concludes that all of the terms and provisions of the Settlement Agreement apply to Kuhn, including §15.3. It is beyond dispute that Kuhn: (1) did not opt out of the Settlement Agreement, (2) submitted to the claims administration process, and (3) accepted a gross benefit award of over $400,000 in benefits from the Claims Administrator. While Kuhn suggested in the Texas lawsuit that the Settlement Agreement was "not binding" on her because she was "fraudulently induced into entering it," she has not made the same argument before this Court; to the contrary, Kuhn states she has no dispute that might "affect[] the benefits she received," docket no. 2974 at 9, signaling she has no wish

13

to rescind her participation in the Settlement Agreement.[10]

Despite Kuhn's retreat from the position that the Settlement Agreement does not bind her, Kuhn continues to argue that §15.3 of the Settlement Agreement, in particular, does not bind her – that is, it does not preclude her from pursuing the discovery she has requested.  Kuhn offers three arguments as to why she is not bound by §15.3, but none of these arguments are remotely meritorious.  First, Kuhn asserts she was not aware of §15.3 *specifically*, and did not give particularized consent to its provisions.  But Kuhn did not give particularized consent to *any* of the provisions of the Settlement Agreement; rather, she gave generalized consent to the entire Agreement, including the provisions that resulted in her receipt of over $400,000 in benefits, the provisions of §15.3, and every other provision.  Kuhn cannot escape the force of a given term in the Agreement, while enjoying the force of its other terms, by arguing she was unaware of the terms she does not like.  To accept Kuhn's first argument would undo completely the law of contract.

Next, Kuhn argues she falls within the exception set out in §15.3, applicable to class members who are "not entitled to benefits" under the Settlement Agreement.  Kuhn insists this exception applies to her

---

[10]  Texas law, for example, has long held that "[o]ne who is induced by fraud to enter into a contract has his choice of remedies.  He may stand to the bargain and recover damages for the fraud, or he may rescind the contract, and *return the thing bought*, and receive back what he paid." *Dallas Farm Machinery Co. v. Reaves*, 307 S.W.2d 233, 238-39 (Tex. 1957) (emphasis added); *see Hendon v. Glover*, 761 S.W.2d 120, 122 (Tex. Ct. App. 1988) ("It is well settled that a party aggrieved by a fraudulent transaction has alternate remedies and may either rescind, or affirm the transaction and recover his damages.  But he cannot do both; he cannot retain all the benefits of the transaction and escape all of the obligations.").  By stating she has no quarrel with, and intends to retain, the Settlement benefits she received, Kuhn has elected to "affirm the transaction" and remain bound by the Settlement Agreement.  Moreover, should Kuhn wish to tender back the benefits received under the Settlement Agreement and rescind her agreement with Sulzer – on fraudulent inducement grounds or otherwise – this Court would have exclusive jurisdiction over such a claim.

because she did not receive EIF benefits, due to Jacks' late filing of her EIF claim form.  The EIF benefits Kuhn did not *receive*, however, are benefits to which she claims she was *entitled* – this is the very basis for her malpractice claim against Jacks.  And it is undisputed that she was *entitled* to (and received) APRS and contingent attorney fee benefits.  The exception in §15.3 referring to persons "not entitled to benefits" simply does not apply to Kuhn.

Finally, Kuhn's third argument is as specious as the first two.  Kuhn asserts that, despite having issued her subpoenae and requests for documents, she has not actually sought to use the evidence she seeks in her Texas lawsuit.  Noting that §15.3 precludes "introduc[ing] or offer[ing]" evidence of Settlement Agreement terms and negotiations "in any judicial proceeding," Kuhn argues this provision does not apply.  But, as Kuhn well knows, the only reason for seeking this evidence is to rely on it, and Kuhn has even explained to the Texas state court how she intends to rely on it to support her claims.  To suggest she has not sought and will not seek to rely on the discovery she seeks in a "judicial proceeding" is untenable.

Indeed, it is Kuhn's in-court explanations regarding what she expects her requested discovery to show that this Court finds most troubling.  The statements that Kuhn made to the Texas court to support her discovery requests may be born of simple ignorance, and not willful dissembling, but the ultimate effect of those statements is to impugn the integrity of both the Settlement Agreement and this Court.  When Kuhn told the Texas judge that "Mr. Jacks got 2.7 million of this $50 million *slush fund*" because "[t]he fix was in," it is virtually impossible not to interpret this statement as an assertion that the undersigned was "in on the fix."  As this Court has explained (in a written opinion that Kuhn has obviously read), the Court oversaw the parties' months-long negotiation of the Settlement Agreement and then held a multi-witness, multi-day, detailed "final fairness hearing" to ensure that all of the terms of the Settlement Agreement – including the

15

setting aside of a maximum of $50 million to pay common benefit attorney fees – was fair, reasonable, and adequate. *See generally In re: Sulzer Hip Prosthesis and Knee Prosthesis Liab. Litig.*, 268 F.Supp.2d 907 (N.D. Ohio 2003), *affirmed*, 398 F.3d 778 (6th Cir. 2005). The fairness of the common benefit attorney fee provisions, in particular, was especially ensured because the Settlement Agreement gave this Court complete discretion on how much to award whom; there was no minimum award required (either individually or in toto), and the Court could (and did) deny completely an award to any given attorney who applied for one.[11]  To imply that this Court would approve a Settlement Agreement containing a "slush fund" designed to benefit attorneys (and, thus, harm injured class members) is insulting.  And to urge that this Court then actively entered a particular award out of this "slush fund" to "swing the deal" and buy off an attorney is even worse.  Counsel for Kuhn may have meant his statements in the Texas courtroom to besmirch only Sulzer and Jacks, but counsel can limit the effect of his mud-slinging only by pretending that this Court's widely-known and central role in giving final approval to the Settlement Agreement, and entering common benefit fee awards, did not exist.

In fact, even a cursory examination of the facts shows Kuhn's statements cannot possibly be true. On August 1, 2002, this Court issued guidelines regarding what factors it would consider when it made common benefit fee awards.  *See* docket no. 378.  This date was more than two months *after* the May 15, 2002 opt out deadline.  Thus, Jacks could not have known, before advising Kuhn on whether to opt out, the basis for any common benefit fee award he might receive from this Court, much less how much.

---

[11]  Of the 57 attorneys who applied for a common benefit attorney fee award, five received an award of zero.  The total of the Court's awards of common benefit attorney fees was about $43 million; the remaining $7 million was applied first to administrative expenses, and then to payment of residual benefits to successful claimants.  *See* docket no. 738.

Jacks then submitted an application for a common benefit attorney fee award of $136,400 – a fraction of the $2.7 million this Court ultimately awarded him, and far less than many other attorneys requested.[12]  At the same time, other attorneys who applied for common benefit attorney fee awards were awarded less than requested, and even denied entirely.  Those attorneys who appealed the amounts of the Court's awards did not succeed.  *In re: Sulzer Orthopedics, Inc.*, 398 F.3d 780 (6th Cir. 2005).  These facts hardly suggest that "the fix was in."

Moving past Kuhn's aspersions, the question becomes: Given that Kuhn agreed to be, and is, bound by the Final Settlement Agreement and all of its terms, what claims may Kuhn now pursue in Texas state court, and what discovery may she obtain in her attempt to prove those claims?  This Court agrees with Sulzer and Jacks that Kuhn is entitled to pursue a claim against Jacks for malpractice, premised on Jacks' failure to timely file the EIF claim form.[13]  Sulzer and Jacks have suggested they believe, however, that it would be appropriate for this Court to exercise jurisdiction over any such claim, rather than the Texas

---

[12]  The $136,400 "lodestar amount claimed" by Jacks was lower than 36 of the other 56 attorneys who applied for common benefit attorney fee awards.  The Court found 100% of this lodestar amount reasonable, a conclusion it reached for only 24 of the 57 attorneys who applied.  *See* docket no. 738, attachment 1 (common benefit attorney fee award chart).  As the Court explained at the time, one of the important factors that helped determine Jacks' award was his decision to forego collection from class members of a total of over $1.65 million in contingent fees, to which he was otherwise entitled.  The Sixth Circuit Court of Appeals explicitly affirmed this Court's consideration of an attorney's "receipt of contingency fees" in its calculation of common benefit attorney fee awards.  *In re: Sulzer Orthopedics, Inc.*, 398 F.3d 778, 780 (6th Cir. 2005).

[13]  *See* Sulzer's reply (docket no. 2972) at 9 ("Kuhn originally filed her lawsuit as a simple negligence action based on Jacks' failure to file her EIF benefit form on time.  Sulzer is not aware of anything improper about such a claim and *is not attempting in any way to prevent Kuhn from moving forward with that claim against Jacks.*") (emphasis in original); hearing tr. at 20 ("[Jacks has] stood ready, willing and able since before this lawsuit was filed to satisfy her claim for our failure to timely file the EIF claim, and stand ready, willing and able today to include interest and reasonable attorney's fees").

17

state court, because this Court retained "continuing and exclusive jurisdiction over the Parties, including

Sulzer, Sulzer AG, and the Class Members * * *, to administer, supervise, interpret, and enforce the

Settlement Agreement in accordance with its terms . . . ." *Injunction Order* at 3.  Sulzer and Jacks assert

that, if only to determine the damages Kuhn might be entitled to receive under her simple malpractice claim,

a fact-finder will have to "interpret the Settlement Agreement," which is within this Court's exclusive

jurisdiction.[14]

      While Sulzer and Jacks have a strong argument, the Court is reluctant to restrict federal/state comity

any more than necessary.[15]  At this juncture, the Court concludes Kuhn should be permitted to pursue her

malpractice action against Jacks in Texas state court; this Court must assume that the state court will

endeavor in good faith to limit its own jurisdiction in accord with the requirements and restrictions set out

---

[14]  Specifically, Jacks asserts that the maximum EIF award that Kuhn could have received, if her claim had been timely filed, was $160,000.  Kuhn responds that, had the EIF claim been timely filed, Jacks could have appealed on the merits the Claims Administrator's determinations that she was not entitled to additional EIF benefit awards, and that she might have obtained the top EIF award of $800,000.  Jacks answers that, to resolve this argument, a judge or jury will have to interpret the Settlement Agreement.

[15]  On the question of comity, it is notable that Kuhn does *not* argue that this Court has no authority generally to enjoin related state court litigation.  In fact, the Supreme Court has recently affirmed that this Court does have "the authority under the [All Writs Act, 28 U.S.C. §1651(a)], to enjoin a party to litigation before it from prosecuting an action in contravention of a settlement agreement over which the district court has retained jurisdiction" –  although this Court cannot use the All Writs Act as a basis for actually taking removal jurisdiction over the related state court litigation itself, and dismissing it.  *Henson v. Ciba-Geigy Corp.*, 261 F.3d 1065, 1068 (11th Cir. 2001), *affirmed sub nom. Syngenta Crop Protection, Inc. v. Henson*, 537 U.S. 28 (2002).

in this Order.[16]  As for the need to interpret the Settlement Agreement, the Court believes the parties have received sufficient interpretation, in the form of communications from the Claims Administrator and the Special Master, and also the plain wording of the CAPs and Settlement Agreement Annex IV, such that additional invocations of this Court's jurisdiction should be unnecessary.

As noted, Kuhn originally filed against Jacks only a claim for simple negligence, based on failure to timely file her claim for EIF benefits.  Pursuant to such a claim, Kuhn could seek the equivalent of any EIF benefits she would have received but for the late filing, reasonable interest from the date on which such benefits likely would have been awarded, and, if permitted under Texas law, other compensatory damages flowing directly from the late filing – for example, reasonable attorney fees incurred in pursuing the equivalent of an EIF award.  Kuhn is free to pursue that claim in Texas state court.  However, Kuhn amended her Texas lawsuit to add claims for fraud, misrepresentation, breach of fiduciary duty, and deceptive trade practices, pursuant to which she seeks in excess of $10 million in damages.  The Court concludes it must enjoin Kuhn from pursuing these claims.  The common theme underlying these additional claims is that Jacks gave Kuhn incorrect or incomplete information about what the Settlement Agreement said, how it worked, whether it was fair, and what might happen if she opted out.  As an example, Kuhn asserts Jacks misrepresented to her the likelihood of obtaining a "better" settlement or verdict if she opted

---

[16]  If Kuhn's counsel continues to push for contravention of this Court's Orders, however, the Court may reconsider the jurisdictional question, along with the question of contempt.  *See* hearing tr. at 38 ("my first inclination would be to say that with [certain] limitations that [Ms.] Kuhn should be able to pursue it in state court, but I have serious concerns about the fact that the plaintiff has gone so far in state court as to attack the underlying settlement in this case, and in fact has represented to this Court that despite clear efforts to do so that [she] has not done so, so the concern by Sulzer and Mr. Jacks that there might be an abuse of this Court's orders if the Court allows that claim to be pursued anywhere other than in this jurisdiction is a real possibility.").

out, when he sent her the following two written statements:

> If too many people decide not to accept the settlement (that is, to "opt out"), then Sulzer has the right to back out.  We should know by the end of May if the number of opt outs will force Sulzer to walk away from the agreement.  We have been told that they will back out unless there is "near unanimous" acceptance.  If the settlement falls through, the general consensus is that Sulzer will take bankruptcy.  We sincerely hope that doesn't happen.  Based on our experience in the Dow Corning breast implant bankruptcy, where our clients, whose suits were filed as much as ten years ago, have yet to receive a penny (and won't for at least another year), we know that as imperfect as it is, this settlement is the better alternative by far.

Letter from Jacks "To Our Sulzer Clients" at 3 (March 5, 2002).

> We must reiterate that Sulzer has indicated repeatedly its intent to file bankruptcy if claimants opt out and attempt to pursue their cases through the courts.  We remain convinced that they will do so.  Anyone contemplating opting out should know that our research convinces us that it will be extremely difficult, if not impossible, to collect any substantial judgment outside the settlement for the following reasons.
> * * *
> In summary, the amount of money committed to the Settlement, over one billion dollars, exceeds the total insurance and assets that will in all likelihood be available from the combined Sulzer entities.  We therefore make the recommendation to you, and to all of our clients, that you participate in the Settlement.

Letter from Jacks to the Kuhns at 1-2 (April 3, 2002).  Kuhn insists that she be allowed to pursue

discovery to show that, in fact, Sulzer was not close to bankruptcy, that an independent settlement outside

of the class Settlement Agreement was both possible and collectible, and that Jacks recommended

participation in the class Settlement Agreement only so he could obtain a common benefit fee award from

the $50 million "slush fund."

To assert that Jacks' above-quoted statements are fraudulent misrepresentations, however, is to

disagree completely with both the reasoning and the ultimate conclusions of this Court that: (1) the

Settlement Agreement was fair, adequate, and reasonable, and (2) the notice given to class members fairly

20

apprised them of the terms of the Settlement Agreement.[17]  The Court did not reach these conclusions lightly.  As to the fairness and reasonableness of the Settlement Agreement, for example, before the parties negotiated their final settlement, the Court authorized, and plaintiffs' counsel engaged in, substantial, far-reaching discovery regarding the financial status and wherewithal of all of the Sulzer-related entities, the availability of insurance proceeds or other assets to satisfy the claims of injured class members, and the likelihood of obtaining *any* relief against the foreign Sulzer entities.  At the final fairness hearing, the Court then received evidence on these points, both by way of live testimony and in the form of voluminous documents, declarations, and deposition transcripts.  Based on this information, the Court made specific findings regarding the extremely low likelihood that a better resolution might be available to the many Sulzer claimants.  For example, the Court noted that "[a] large number of attorneys and witnesses representing disparate interests all averred they believe the Settlement Agreement has extracted from the defendants close to the best terms possible without forcing the defendants into bankruptcy – an alternative that all felt would be disastrous for the Class.  One witness – who had earlier opposed both national class certification and the terms of the first proposed settlement agreement – summed up when he testified he believes the current Settlement Agreement is 'the best opportunity for the most people to recover the most money the soonest.'"  *In re: Inter-Op Hip Prosthesis Product Liab. Litig.*, 2002 WL 1359693 at *1 (N.D. Ohio

---

[17]  *See* docket no. 244 (approving the form of the proposed Final Notice of Settlement); *see also* Final Notice at 15 (explaining to class members that "The Settlement also provides for a separate Common Benefits Fund from which [various] attorneys will be compensated for their efforts.  Specifically, the Settlement provides for a Common Benefit fee not to exceed Fifty Million Dollars ($50,000,000.00) and expenses not to exceed Seven Million Five Hundred Thousand Dollars ($7,500,000.00).  Class Counsel and **individual plaintiff's counsel that did work for the benefit of the Class** may apply to the Court for an award of attorney fees and expenses from this fund.  These attorney fees will not reduce any benefits provided to Class Members under the Settlement.") (emphasis added).

21

May 8, 2002).  One reason that the Settlement Agreement was attractive to the plaintiff class was that,

"although no plaintiff had yet succeeded at obtaining jurisdiction over the [foreign] 'great-grandparent

company,' Sulzer AG, the plaintiffs obtained a settlement commitment from Sulzer AG of $50 million in

cash and over 480,000 shares of Sulzer Medica stock." *In re: Sulzer*, 268 F.Supp.2d at 917.  The Court

further summarized:

> By the time of the Final Fairness Hearing, counsel for plaintiffs (both within and without the
> MDL) were virtually unanimous that, in fact, the defendants were paying as much as they
> could to the plaintiff class to resolve the litigation.  Indeed the Court concluded that "the
> sizeable and detailed record compiled by the parties *compels* the conclusion that this
> settlement represents an eminently fair and reasonable resolution for the entire Plaintiff
> Class."  [*In re: Sulzer*, 2002 WL 1359693 at *1] (emphasis in original).
>
> Not only is the amount of recovery of great value to the class, it is fair to say that
> the most significant benefit to the class is any "settlement of this litigation for a reasonable
> amount," especially given the advanced average age of the class.  *Telectronics*, 137
> F.Supp.2d at 1042.  At times, this Court acted as a mediator during the parties'
> negotiations, so the Court has personal knowledge of how close one or more of the Sulzer
> defendants came to declaring bankruptcy – very.  Other medical device companies in the
> same circumstances have been forced into bankruptcy, thereby causing great delay in
> recovery of any money at all to any plaintiff.  *See, e.g., In re Dow Corning Corp.*, 86
> F.3d 482, 485-86 (6th Cir. 1996).

*In re: Sulzer*, 268 F.Supp.2d at 931 (parenthetical and footnote omitted).

Of course, the time for appealing these determinations to the Sixth Circuit is long past, and Kuhn

may not collaterally attack this Court's conclusions in a Texas state court.  *See In re: Sulzer Orthopedics*

*and Knee Prosthesis Prods. Liab. Litig.*, 399 F.3d 816, 817 (6th Cir. 2005) (dismissing as untimely an

appeal by a non-opt-out class member who challenged the Settlement Agreement provisions regarding

common benefit fee awards).  Further, as provided in §15.3 of the Settlement Agreement, Kuhn earlier

agreed that she would not rely upon precisely that evidence which she now insists she needs to pursue these

additional claims.  Accordingly, the Court must conclude that Kuhn cannot prosecute in Texas state court

her claims against Jacks for fraud, misrepresentation, breach of fiduciary duty, and deceptive trade practices, because to do so would: (1) be tantamount to an appeal of this Court's earlier Orders; and (2) be in breach of §15.3 of the Settlement Agreement.

**IV.  Conclusion.**

The Court concludes that Sulzer's and Jacks' motions for permanent injunctive relief must be granted, as follows.  Pursuant to the Court's *Injunction Order*, the Settlement Agreement, and the All Writs Act, 28 U.S.C. §1651(a), Kuhn is hereby permanently enjoined from pursuing claims for fraud, misrepresentation, breach of fiduciary duty, deceptive trade practices, or similar legal theories against Jacks, whether in connection with her existing Texas lawsuit or any other lawsuit.  Further, Kuhn is enjoined from challenging (whether directly or indirectly) in her Texas lawsuit or any other lawsuit, and from pursuing discovery regarding: (1) the propriety of, basis for, or amount of any common benefit fee awards; (2) the adequacy of Notice to class members of the terms of the Settlement Agreement; and (3) the fairness, adequacy, or reasonableness of any provision contained in the Settlement Agreement.

Kuhn may, as noted, pursue a negligence claim in Texas state court for damages flowing directly from the failure to timely file her application for EIF benefits, subject to the limitations set forth in this Order.

**IT IS SO ORDERED.**

s/Kathleen M. O'Malley
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED:** October 18, 2005

\\clesto\user\huthcm\Wptext\WPDOCS\01-9000-Kuhn-Jacks.ord.wpd