01cv9000-zd-InsurerPayments.wpd

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |  |
|---|---|---|
| | : | **Case No. 1:01-CV-9000** |
| | : | |
| **IN RE: SULZER HIP PROSTHESIS** | : | **(MDL Docket No. 1401)** |
| **AND KNEE PROSTHESIS** | : | |
| **LIABILITY LITIGATION** | : | **JUDGE O'MALLEY** |
| | : | |
| | : | **MEMORANDUM AND ORDER** |
| | : | |

Certain Health Insurance Companies move this Court for an Order awarding them additional subrogation payments of $1,088,156.80, payable by the Sulzer Settlement Trust (docket no. 3270). Counsel for the plaintiff class opposes this request. For the reasons stated below, the motion is **DENIED**.

## I. Background.

In this MDL, Sulzer faced claims from Class Member recipients of Sulzer hip and knee implants. Sulzer settled these claims pursuant to the Class Action Settlement Agreement (docket no. 361). In connection with doing so, Sulzer also negotiated a number of "subrogation agreements" with various health insurance companies. These health insurance companies had paid for Class Member implant-related medical expenses; the "subrogation agreements" ensured that Class Members' awards under the Settlement Agreement would not be effectively reduced by the amounts of medical claims that third-party payor health insurance companies might pursue against the Class Members.

Central to the pending motion is one such subrogation agreement, negotiated between Sulzer and a group of nine health insurance companies, referred to below as the "Health Plans." Ultimately, the Health Plans' motion for an award of additional subrogation payments is governed by three intertwining agreements: (1) the Class Action Settlement Agreement; (2) the Health Plan Settlement Agreement (docket no. 357-2); and (3) a Letter Addendum to the Health Plan Settlement Agreement (docket no. 3270, Exh. A).

In regard to implant-related medical expenses, the Class Action Settlement Agreement provided that $60 million would be allocated to a "Subrogation and Uninsured Expenses Sub-Fund" for payment to health insurance companies, hospitals, doctors, and so on.[1] The Class Action Settlement Agreement further provided that the Settlement Trust would "hold Class Members . . . harmless against any claims by a subrogee [such as a health insurance company or a hospital] directly against such Class Member . . . for reimbursement of medical expenses . . . necessitated by an Affected Product."[2] Essentially, this meant that all implant-related medical expense claims made upon a Class Member by a doctor, hospital, or health insurance company would be taken care of by the Settlement Trust. On the other hand, the Class Action Settlement Agreement also provided that these medical expense payments made by the Settlement Trust would "not exceed . . . $15,000 in aggregate for any and all claims made in respect of a single Affected Product Revision Surgery," unless first approved by Sulzer.[3] The combined effect of these latter two provisions served to notify health insurance companies that they faced three choices: (1) accept the "standard offer" from the

---

[1] Class Action Settlement Agreement §2.2(e).

[2] *Id.* §3.9(c).

[3] *Id.* §3.9(a).

2

Sulzer Settlement Trust of up to $15,000 per revision surgery, in full payment of their subrogated claims for related medical expenses; (2) sue the Class Member for the entire amount of their subrogated medical expenses, in which case the Sulzer Settlement Trust would defend the Class Member; or (3) negotiate some other terms with Sulzer and/or the Settlement Trust.

Like many others, the movant Health Plans chose the third option and entered into the Health Plan Settlement Agreement. This Agreement provided that, in connection with each "Covered Revision Surgery," Sulzer would pay up to $15,000 to any Health Plan that was the "Primary Payor" of certain related medical expenses, and up to an *additional* $5,000 to any Health Plan that was the "Secondary Payor" of these medical expenses.[4] In this way, the nine Health Plans combined to obtain higher reimbursement levels than the "standard offer" set out in the Class Action Settlement Agreement.

Of course, Sulzer and the Health Plans knew that even these higher amounts still might not reimburse the Health Plans completely. Accordingly, in a letter addendum to the Health Plan Settlement Agreement, Sulzer "recognize[d] that the Settling Health Plans may have incurred costs in excess of" the $15,000 and $5,000 caps, and agreed as follows:

> [I]n the event that there are funds remaining from the $60 Million committed to the [Subrogation and Uninsured Expenses Sub-Fund] after payment of . . . the Settling Health Plans, . . . the remainder, if any, of the $60 Million Sub-Fund will be allocated by the Court, with recommendations from the Settling Health Plans, by and through their undersigned counsel of record, class counsel, special state counsel committee, and the Sulzer Settlement Trustee . . . .

Letter Agreement at 2. This provision ensured that the nine Health Plans would have a voice regarding how any residual Settlement Trust funds might be allocated, but the final choice of

---

[4]  Health Plan Settlement Agreement §III.B(2, 3).

3

distribution would remain with the Court.

As set out in the Class Action Settlement Agreement, the Sulzer Settlement Trust received initial funding from Sulzer and related entities of about $1 Billion.  The Class Action Settlement Agreement also contained a number of contingent clauses, however, calling upon Sulzer to provide additional funds if certain events occurred.  One of these clauses provided that, if a Class Member had no health insurance at all, then Sulzer would provide additional funds in payment of *all* of that Class Member's medical expenses, even in excess of the $15,000 cap.[5]  When Sulzer agreed to this contingent provision, it was not known how many uninsured Class Members would submit a claim, nor the amounts of their medical expenses.  The Sulzer Settlement Trust ultimately made a demand upon Sulzer for $582,520.06 pursuant to this provision.

In the four years following all of these settlement agreements, the Sulzer Settlement Trust paid out about $1.025 Billion to implant recipients and their health insurance companies.  Once the vast majority of the claims made upon the Trust were resolved, the Trust's Claims Administrator moved the Court for an Order approving Trust "Wind-Up Procedures."  The Claims Administrator noted that, of the final total of $1.143 Billion that had been placed into the Trust, only about $59 million remained.  The Claims Administrator also explained that, while it was conceivable that the Trust would become responsible for additional claims and expenses through the year 2012, these expenses were fairly predictable and would not approach $59 million.  Recognizing that the Settlement Trust had served the great majority of its intended purposes, the Court granted the Claims Administrator's motion to begin winding up the Sulzer Settlement Trust.  *See* docket no. 3267 ("*Wind-Up Order*").

---

[5]  Class Action Settlement Agreement §3.9(a).  The Class Action Settlement Agreement further provided for an aggregate cap of $2 million for medical expense payments on behalf of uninsured Class Members in excess of the $15,000 per-surgery cap.  *Id.*

Among other things, the *Wind-Up Order* directed the Claims Administrator to hold, in various "Reserve" funds, certain amounts of money to pay claims and expenses that might yet arise before the Trust termination date. These Reserves totaled $13 million.[6] The *Wind-Up Order* directed the Claims Administrator to distribute the other $46 million to class members on a *pro rata* basis.[7] If any balance remains when the Trust terminates, the Class Action Settlement Agreement provides that the parties and the Court may agree to "another *pro rata* distribution to Class Members or, in the event the amount is negligible, a donation to a neutral medical research institute or university or to charity."[8]

With regard specifically to the Settlement Trust's Subrogation and Uninsured Expenses Sub-Fund, when the Court entered the *Wind-Up Order*, there remained less than $29 million of the original $60 million. Of this remaining amount, the Court directed the Claims Administrator to reserve: (1) $3.7 million for subrogation claims then currently pending; and (2) another $1 million for future subrogation claims.[9] In addition, the *Wind-Up Order* states:

> The Claims Administrator has been advised that some Third Party Payors may seek additional payments from the Subrogation and Uninsured APR Sub-Fund pursuant to certain provisions of settlements those Third Party Payors entered into with Sulzer and honored, pursuant to Settlement Agreement §3.9(a), by the Trust. The Court ORDERS that:
> a.      Any such requests for additional payments be submitted to the Court for consideration no later than October 31, 2006.

---

[6] The *Wind-Up Order* initially directed the Claims Administrator to place in various Reserves a total of about $25 million. The *Wind-Up Order* also provided, however, that, if changed circumstances "permit a reasonable conclusion that the Reserves may be reduced, then the Claims Administrator may so reduce them, further provided that the Reserves shall, in total, be at least $10 million." *Wind-Up Order* at 18, ¶90(a). Ultimately, the Claims Administrator set aside $13 million in Reserves and distributed pro rata $46 million to Class Members.

[7] *See id.* at 17.

[8] Class Action Settlement Agreement §15.6.

[9] *See Wind-Up Order* at 8-9.

5

     b.      The Claims Administrator create a reserve of $2 million for payment of any such additional requests if granted by the Court.

*Wind-Up Order* at 10, ¶45.

As the Claims Administrator predicted, certain third-party-payor health insurance companies did "seek additional payments from the Subrogation and Uninsured APR Sub-Fund." Specifically, five of the nine Health Plans that were parties to the Health Plan Settlement Agreement now ask the Court to enter an Order awarding them a total of about $1.1 million in additional reimbursement.[10] This amount represents "the amount of medical expenses [they paid to class members] in excess of the capped amounts already approved and paid to [them]" by the Sulzer Settlement Trust. Motion at 2. The Health Plans explain they believe this request for additional reimbursement is conservative.

The Court examines the Health Plans' request below.

**II. Analysis.**

Pursuant to all of the terms regarding medical expense reimbursement discussed above, the five movant Health Plans received a total of $1,626,471.05 from the Sulzer Settlement Trust. The $15,000 and $5,000 caps, however, came into play often: the five Health Plans aver they have spent another $1,088,156.80 in medical expenses in excess of these caps, for which they received no reimbursement. The Health Plans ask the Court to enter an Order awarding them this difference, making their reimbursement complete.

In support of their request, the Health Plans make two primary points. First, after the vast

---

[10]  The movants are: (1) BlueCross BlueShield of Alabama, (2) BlueCross BlueShield of Florida, (3) BlueCross BlueShield of North Carolina, (4) BlueCross BlueShield of Massachusetts, and (5) Trigon BlueCross BlueShield. No other third party payors seek additional payments.

majority of the claims made upon the Sulzer Settlement Trust had been resolved through the Claims Administration process, there remained $29 million earmarked to pay for medical expenses in the Subrogation and Uninsured Expenses Sub-Fund.  The Health Plans explain that, when the settlement agreements were all being negotiated, they agreed to the reimbursement caps so that the Class Members could be assured of receiving their benefits.  Their agreement to accept the caps, however, was made with the explicit understanding that they could petition for full reimbursement if there was money left at the end of the process.  Now that virtually all settlement payments to Class Members have been made – leaving a large surplus in the Subrogation and Uninsured Expenses Sub-Fund – the Health Plans ask that their caps be lifted retroactively.  The Health Plans note that their $1.1 million request amounts to a small percentage of the $29 million Sub-Fund remainder, which was originally set aside precisely for payment of subrogated medical expense claims.

This argument has some logic, but it does not represent the facts fully.  First, the $29 million remainder in the Subrogation and Uninsured Expenses Sub-Fund is, to some extent, artificially large.  The amounts initially allocated to each of the seven Funds and Sub-Funds described in the Class Action Settlement Agreement were the parties' rough estimates of what amounts the Claims Administration Process might require for each type of claim.[11]  Recognizing this, the Class Action Settlement Agreement specifically provided that the Claims Administrator could "re-allocate" the amounts in the various funds "as necessary to provide benefits to Class Members."[12]  Thus, for

---

[11] The Class Action Settlement Agreement referred to "the Medical Research and Monitoring Fund, Unrevised Affected Product Recipient Fund, Professional Services Fund, Subrogation and Uninsured Expenses Sub-Fund, Plaintiffs' Counsel Sub-Fund, Affected Product Revision Surgery Fund, and Extraordinary Injury Fund."  Class Action Settlement Agreement §1.1(oo).

[12] *Id.* §2.2(f).

7

example, two years into the Claims Administration Process, $45 million of the $75 million then contained in the Unrevised Affected Product Recipient Fund was re-allocated, with $25 million transferred to the Affected Product Revision Surgery Fund and $20 million transferred to the Plaintiffs' Counsel Sub-Fund.  This re-allocation could as easily have reduced the funds contained in the Subrogation and Uninsured Expenses Sub-Fund.  That the Health Plans' $1.1 million request is only a small percentage of the $29 million remainder is, therefore, somewhat arbitrary.

In addition, it is a misstatement for the Health Plans to suggest that they "agreed to delay and reduce full payment of their claims pending the success of the settlement as a whole," and could have instead "insisted on full payment of their subrogation liens despite the possibility that some [Class Members] might not receive the full value of their [settlement benefits]."  Memo. in support at 6.  It is true that the Health Plans' negotiation of an agreement to accept capped reimbursement amounts made the Claims Administration process far easier than if they had chosen the second option of litigating their claims for medical expenses against each insured Class Member.  But it is also true that the Health Plans received important strategic gains under their Health Plan Settlement Agreement – the Health Plans did not agree altruistically to the capped reimbursements just to ensure Class Members received all their benefits.  Specifically, the Health Plans had obtained, at best, only partial success in identifying which of their insureds were Sulzer implantees.  Under the Health Plan Settlement Agreement, Sulzer agreed to identify all implantees who required revision surgery, making it vastly easier for the Health Plans to obtain *any* subrogated amount for medical expenses paid on behalf of Class Members – capped or not.  The real reason the Health Plans did not "insist[] on full payment of their subrogation liens" is that they did not know who the lienees were.  Moreover, it is simply not true that the agreement to the settlement caps was somehow contingent, as the Health Plans

8

argue.  While the Settlement Agreement does not foreclose the possibility of payments in excess of the caps, it certainly did not guarantee it.  Indeed, it is apparent that the Settlement Agreement did not even contemplate a probability that additional payments to third-party payors in excess of the caps might occur.

The second point made by the Health Plans is that, pursuant to §3.9(a) of the Class Action Settlement Agreement, *all* of the medical expenses were paid on behalf of uninsured Class Members, even amounts in excess of the $15,000 cap.  The Health Plans assert they are "similarly situated" to these uninsured Class Members, so they should also obtain complete reimbursement, now that it is clear there are medical expense funds in the Sulzer Settlement Trust still available.  There are two serious flaws, however, with this argument.

The first flaw is that the uninsured Class Members received "complete reimbursement" for medical expenses from *Sulzer*, which paid them these contingent reimbursements *in addition* to all other amounts Sulzer had already paid into the Settlement Trust.  In contrast, the Health Plans seek "complete reimbursement" from *the residue of the Sulzer Settlement Trust* – the primary beneficiaries of which are the injured Class Members.  The first reimbursement worked to increase total Class Member benefits, while the second would work to decrease them.

The second flaw is that "complete reimbursement" might be a real possibility for the Health Plans, but it is illusory for any uninsured Class Member.  If the Health Plans receive the $1.1 million they now seek, they would emerge virtually unscathed by the medical tragedy that this MDL represents and, thus, would have suffered no compromise of their claims at all.  In contrast, juries awarded more than $15 million to the only three Sulzer implant recipients who went to trial, to "make

them whole."[13] The total of the Settlement Benefits received by an uninsured Class Member in this MDL – even including the additional reimbursements by Sulzer for uninsured medical expenses – are a fraction of that. The assertion that full reimbursement of medical expense payments to a Health Plan is appropriate because that is what an uninsured Class Member received, and the two are "similarly situated," is to focus only upon medical expenses, and not on any other aspect of the Class Member's loss.

Although the Court does not find persuasive the Health Plans' suggestion that the Court should "treat similarly situated claimants alike,"[14] this suggestion does properly invoke the Court's equity powers. The Supreme Court has confirmed that a court's disposition of the residue of a common fund trust corpus is governed by principles of equity.[15] In addition to equitable principles, the Class Action Settlement Agreement, itself, explains the parties' agreement regarding this residue:

> Class Counsel, together with the Special State Counsel Committee, shall make a determination, subject to the approval of the Court, with respect to the disposition of any amounts remaining in any particular Fund upon the satisfaction in full of all obligations to pay Class Members and Plaintiffs' Counsel pursuant to this Settlement Agreement, which may include a *pro rata* distribution to Class Members or in the event the amount is negligible, a donation to a neutral medical research institute or university or to charity.

---

[13] On August 30, 2001, the Texas state court case of *Rupp v. Sulzer Orthopedics, Inc.* ended with a $15.5 million jury verdict for three plaintiffs, apportioned as follows: plaintiff Sallinger, $1.5 million actual damages and $7.15 million punitive damages; plaintiff Bonorden, $1 million actual damages and $3.85 million punitive damages; plaintiff Rupp, $1.75 million actual damages, no punitive damages. The average actual damage award of almost $1.5 million in *Rupp* far exceeded the average Settlement Benefit received by Class Members who suffered revision surgery.

[14] Memo. in support at 7.

[15] *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) (addressing the question of whether common benefit attorney fees should be assessed against the settlement trust residue, consisting of unclaimed funds, and stating that "the common-fund doctrine reflects the traditional practice in courts of equity").

10

Agreement at §15.6.

Of high importance in the Court's weighing of the equities is that Class Counsel – who represents the Trust's principal beneficiaries – *opposes* the Health Plans' request for additional reimbursement.  Class Counsel points out that the *Wind-Up Order* directed the Claims Administrator to distribute $46 million of the $59 million remainder as additional pro rata compensation to Class Members, who had received before that a total of about $1 Billion.  This represents additional compensation to Class Members of less than 5%.  In comparison, the five Health Plans now seek additional reimbursement of $1.1 million, having already received $1.6 million.  This represents additional compensation of about 67%.  The Court must agree with Class Counsel that such a result is not supported by the equities of this case.

The various MDL-related settlement agreements signed by Sulzer – including both the Class Action Settlement Agreement and the Health Plan Settlement Agreement – provided for payment to claimants against Sulzer of only a part of their losses.[16]  The Health Plans' request to be made entirely whole seeks preferential treatment relative to other health insurance companies and, more important,

---

[16]  Indeed, the theme of *partial* reimbursement extended also to Class Members' attorneys, who – regardless of their contractual rights otherwise – were: (1) encouraged in the Class Action Settlement Agreement to accept a reduced payment of their contingent attorney's fees; and (2) limited by the Court, in the *Wind-Up Order*, to a 25% contingent fee on the additional *pro rata* distribution (and urged to forego even that).  *See* docket no. 620 (*"Sebastien Order"*) at 4 n.8 (noting that "[m]any attorneys, even though they had contingency fee contracts with class members obligating the class member to pay more than the contingency fee benefits provided by the Settlement Trust, simply accepted the payments from the Settlement Trust as payment in full," because, "given the total funds available to pay damages to the entire class, their clients were not receiving full reimbursement for their injuries"); *Wind-Up Order* at 20, ¶90(b)(vi) ("The Court has ordered that, regardless of pre-existing contingency fee contracts allowing a greater amount, a Class Member's attorney may collect a contingent fee of no more than 25% of the enclosed [*pro rata* disbursement] payment.  Further, the Court encourages these attorneys to consider foregoing or further reducing their fee.").  The Court has consistently been more concerned with reimbursement to injured Class Members than to their attorneys or health insurers.

11

relative to the Sulzer Settlement Trust Class Member beneficiaries.  Because neither equity nor the terms of the Class Action Settlement Agreement support this request, the Health Plans' motion is **DENIED**.

      **IT IS SO ORDERED.**

/s/ Kathleen M. O'Malley      
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED**: April 5, 2007

12