01cv9000-zg(Medicare).wpd

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| | : | **Case No. 1:01-CV-9000** |
| | : | |
| **IN RE: SULZER HIP PROSTHESIS** | : | **(MDL Docket No. 1401)** |
| **AND KNEE PROSTHESIS** | : | |
| **LIABILITY LITIGATION** | : | **JUDGE O'MALLEY** |
| | : | |
| | : | **MEMORANDUM AND ORDER** |
| | : | |

For the reasons stated below, the Claims Administrator's motion for adjudication of obligations regarding Medicare settlement (master docket no. 3356) is **GRANTED as unopposed**. The obligations of the parties are set out in section IV of this Order.

**I.      Background.**

On June 9, 2001, the Judicial Panel on Multidistrict Litigation assigned oversight of this MDL to the undersigned. Plaintiffs in the MDL claimed that defendant Sulzer Orthopedics, Inc. sold two different types of medical implants with manufacturing defects. The two implants were: (1) the "Inter-Op acetabular shell," which was a component of a system used for complete hip replacements; and (2) the "Natural Knee II Porous-Coated Stemmed Tibial Baseplates," which was a component of a system used for complete knee replacements. The Court refers below to these products simply as "Sulzer hip implants" and "Sulzer knee implants."

On May 8, 2002, the Court entered an Order granting final certification to a national Plaintiff Settlement Class (and sub-classes), and granting final approval to a settlement agreement between the Plaintiff Class and Sulzer.[1]  The Settlement Class included plaintiffs with both Sulzer hip implants and Sulzer knee implants.  The principal financial terms of the Master Settlement Agreement were: (1) Sulzer would place about $1 billion into a Settlement Trust; (2) a Claims Administrator would oversee payments from the Trust; (3) the Claims Administrator would issue certain settlement benefit amounts directly to class members and their attorneys; and (4) the Claims Administrator would also indemnify class members against claims for subrogation or reimbursement for qualifying medical expenses.[2]  It is the last obligation that the Claims Administrator raises with his instant motion.

Specifically, the Center for Medicare and Medicaid Services ("CMMS") asserted it paid for medical care for some of the class members who were injured by Sulzer hip implants and Sulzer knee implants; accordingly, CMMS sought reimbursement for these medical expense payments.  On May 2, 2002, Sulzer and CMMS entered into an agreement (the "Hip Implant Agreement") resolving CMMS's claims for reimbursement related to Sulzer hip implants.  The Hip Implant Agreement did not address CMMS's claims related to Sulzer knee implants.

Essentially, the Hip Implant Agreement resolved CMMS's medical expense claims in the following manner.  The Claims Administrator agreed to provide CMMS with a list of all plaintiff class members who underwent "revision surgery" to remove and replace a Sulzer hip implant.  The list included each class member's name, gender, birth date, social security number, date of revision surgery, and so on.  CMMS was then required to provide the Claims Administrator with a "Response

---

[1]  *See* master docket nos. 340 & 353.

[2]  *See* master docket no. 361 (composite Master Settlement Agreement).

List" identifying which of these class members were "Covered Medicare Beneficiaries" – meaning a person who had received Medicare benefits for the revision surgery.[3]  The Claims Administrator then paid to CMMS a pre-determined amount for each Covered Medicare Beneficiary, as payment in full of all subrogation rights CMMS had against that plaintiff class member.[4]

The mechanisms set out in the Hip Implant Agreement worked, and there is no dispute between CMMS and the Claims Administrator regarding reimbursement for medical expense payments related to Sulzer hip implants.  The same cannot be said, however, regarding CMMS's quest for reimbursement of medical expense payments related to Sulzer knee implants.

On July 30, 2009, Sulzer and CMMS entered into a second agreement (the "Knee Implant Agreement"), designed to resolve CMMS's claims for reimbursement of medical expenses related to Sulzer knee implants.  The general outlines of the Hip Implant Agreement and the Knee Agreement were the same, although the second agreement was stated more succinctly – the Hip Implant Agreement was 35 pages long (double-spaced), while the Knee Implant Agreement was only five pages long (single spaced).  As in the prior Hip Implant Agreement, the Knee Implant Agreement provided that: (1) the Claims Administrator would provide CMMS with a list of all plaintiff class members who underwent revision surgery to remove and replace a Sulzer knee implant; (2) CMMS would provide the Claims Administrator with a "Response List" identifying which of these class

---

[3]  Specifically, the Hip Implant Agreement defined "Covered Medicare Beneficiary" as a plaintiff class member who "(1) has undergone an Affected Product Revision Surgery . . . ; and (2) is entitled to and is receiving medical insurance benefits under Part A (hospital insurance benefits) and/or, if elected by such individual, Part B (supplementary medical insurance) of the Medicare program on the Affected Product Revision Surgery Date.

[4]  For example, the Hip Implant Agreement stated that, "[f]or those Covered Medicare Beneficiaries receiving both Medicare Part A and Part B benefits on the Affected Product Revision Surgery Date, the Per-Beneficiary Cap shall be $15,000."

3

members were "Medicare beneficiaries;" and (3) the Claims Administrator would then pay to CMMS $15,000 for each Medicare beneficiary.

Unlike the Hip Implant Agreement, however, the Knee Implant Agreement did not define "Medicare beneficiary."  As explained below, CMMS has seized on this absence of definitional language to create a dispute regarding the amount the Claims Administrator owes CMMS under the Knee Implant Agreement.

Before explaining this dispute, the Court quotes one other notable provision contained in the Knee Implant Agreement: "[CMMS] waives any objections and agrees to submit to the jurisdiction of the United States District Court for the Northern District of Ohio to resolve any and all disputes arising in connection with this Settlement Agreement."  Agreement at 4.

## II.     The Dispute.

As noted in footnote 3, the Hip Implant Agreement defined a "Covered Medicare Beneficiary" as a plaintiff class member who actually *received* Medicare benefits related to Sulzer hip implant revision surgery.  The Claims Administrator asserts that, in similar fashion, the term "Medicare beneficiary" in the Knee Implant Agreement means a plaintiff class member who actually *received* Medicare benefits related to Sulzer knee implant revision surgery.  Accordingly, the Claims Administrator insists the "Response List" that CMMS must provide should include only individuals who actually *received* Medicare benefits related to Sulzer knee implant revision surgery, similar to the Response List required by the Hip Implant Agreement.

The knee implant Response List provided by CMMS, however, names every plaintiff class member included on the Claims Administrator's original list who is enrolled in Medicare, "regardless

4

of whether Medicare actually paid any money for the Subject Class Member's [knee implant revision surgery]."[5]  CMMS undertook no effort to further whittle this list of enrollees to include only those plaintiff class members for whom it paid any qualifying medical expenses.  Essentially, CMMS asserts that, under the Knee Implant Agreement, the Claims Administrator simply owes it $15,000 for every plaintiff class member who was at least 65 years old at the time of revision surgery, for a total of about $4.9 million.  Under this view, whether the class member ever actually received any payment of Medicare benefits is irrelevant.

Apparently, the Claims Administrator has tried to resolve his dispute with CMMS by offering "to split the cost of researching [CMMS's] databases to determine the identities of Class Members for whom [CMMS] paid for a [knee implant revision surgery]."[6]  The Claims Administrator has also offered "to compromise the dispute by paying $2.0 million to [CMMS,] which amount would be consistent with historical rates of payment" in connection with Sulzer hip implant reimbursements.  CMMS has refused these and all other offers to resolve its dispute with the Claims Administrator, however, insisting it is entitled to payment of $15,000 for every Medicare enrollee on the knee implant "Response List."

## III.   Resolution.

With the instant motion, the Claims Administrator seeks only declaratory relief, asking the Court to order CMMS to provide "a Response List, as required by the 2009 Agreement, identifying

---

[5] Memorandum in support at 3.  Because CMMS has not filed any response to the Claims Administrator's motion, the undisputed facts stated are those recited by the Claims Administrator.

[6] Motion at 4.

which of the Subject Class Members identified to Medicare by the Claims Administrator are Medicare

beneficiaries *who received some Medicare benefits related to their [knee implant revision] surgery.*"

Motion at 9 (emphasis added).  This declaration requires a conclusion that the Claims Administrator's

interpretation of the Knee Implant Agreement is correct, and CMMS's interpretation is not.  This

conclusion is easy to reach, for a number of reasons.

First, a great deal of the language contained in the Knee Implant Agreement, not to mention

its basic mechanism, is identical to the Hip Implant Agreement.  It is beyond question that, when the

Claims Administrator and CMMS executed the Knee Implant Agreement, they meant to replicate

almost all of the terms and procedures of the Hip Implant Agreement.  While the Knee Implant

Agreement left the term "Medicare beneficiaries" undefined, the Hip Implant Agreement specified

that the analogous term "Covered Medicare Beneficiary" included only those plaintiff class members

who had *received Medicare benefits* for revision surgery.  There is no good reason – certainly none

provided by CMMS – to conclude that the complete absence of definitional language in the Knee

Implant Agreement was meant to signal a *change* in the mechanism the parties were already using to

settle identical disputes.  To the contrary, the failure to define "Medicare beneficiaries" in the Knee

Implant Agreement suggests the parties did *not* mean to change their existing method of determining

how much the Claims Administrator would pay CMMS to extinguish its subrogation rights.  Had the

parties meant to alter so dramatically their existing pattern, it is far more likely they would have done

6

so explicitly, and not through silence.[7]

It is also worth noting that the term "Medicare *beneficiary*" necessarily suggests the class member at issue received some sort of *benefits* – that is what the term "beneficiary" means.[8] CMMS's interpretation of this term would include class members that never received any Medicare benefits. This interpretation gives an odd and unreasonable definition to the word "beneficiary" that is outside of the word's ordinary meaning.[9]

In addition, other provisions contained in the Knee Implant Agreement show that the parties clearly did not intend "Medicare beneficiaries" to mean simply "Medicare enrollees." As noted, the Knee Implant Agreement initially requires the Claims Administrator to provide CMMS with a list of all plaintiff class members who underwent knee implant revision surgery. The Agreement provides that this list "shall identify each Class Member by his or her name, sex, date of birth, social security number, *and date of [revision surgery]*, to the extent [the] Claims Administrator is aware of that information." Agreement at 2 (emphasis added). The only reason CMMS would require, or the

---

[7]  "When contractual language is reasonably susceptible to more than one meaning, all objective extrinsic evidence is considered: the overt statements and acts of the parties, the business context, *prior dealings between the parties*, and the business customs and usage in the industry." *Seaford Golf and Country Club v. E.I. DuPont de Nemours and Co.*, 2006 WL 2666215 at *5 (Del. Super. Ct. Aug. 23, 2006) (emphasis added) (citing *Klair v. Reese*, 531 A.2d 219, 223 (Del. 1987).
    The Court cites Delaware law because the Knee Implant Agreement provides it "shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without reference to its conflicts of law provisions." Agreement at 4.

[8]  *See* www.merriam-webster.com (defining "beneficiary" to mean "one that benefits from something" or "the person named (as in an insurance policy) to receive proceeds or benefits."

[9]  *See Sassano v. CIBC World Markets Corp.*, 948 A.2d 453, 462 (Del. Ch. 2008) ("When interpreting a contract, the court's ultimate goal is to determine the parties' shared intent. Because Delaware adheres to the objective theory of contract interpretation, the court looks to the most objective indicia of that intent: the words found in the written instrument. As part of this initial review, *the court ascribes to the words their 'common or ordinary meaning*,' and interprets them as would an 'objectively reasonable third-party observer.'") (emphasis added, citations omitted).

Claims Administrator would need to provide, a class member's "date of revision surgery" would be for CMMS to determine whether the class member received Medicare benefits in connection with the surgery.  Had the parties intended the Claims Administrator simply to pay $15,000 for each Medicare enrollee, regardless of whether the enrollee ever received Medicare benefits in connection with revision surgery, this term would have been unnecessary.  When a Court is asked to interpret a contract, an interpretation that gives effect to each term of the agreement is preferable.[10]

Finally, use of the word "beneficiary" elsewhere in the Knee Implant Agreement illustrates the parties meant for the term to include only class members who received Medicare benefits, and not mere Medicare enrollees.  Regarding the list the Claims Administrator must first provide to CMMS, the Agreement states: "Claims Administrator will provide to [CMMS] a list of Class Members who were eligible *beneficiaries* for [revision surgery] benefits from the Sulzer Settlement Trust[,] whose [surgery] involved the revision of a [Sulzer knee implant]."  Agreement at 1 (emphasis added).  Just as a "beneficiary" of the Sulzer Settlement Trust is understood to be a class member who received "benefits" from the Trust, so must a "beneficiary" of CMMS be understood to be an individual who received Medicare benefits.  An individual who is enrolled in Medicare but received no Medicare benefits – like a class member who applied to the Sulzer Trust for settlement benefits but was denied and received none – is not a "beneficiary."

In sum, as between CMMS's interpretation of the Knee Implant Agreement and the Claims Administrator's interpretation, it is clear the latter is correct.  The Knee Implant Agreement does not

---

[10] *See O'Brien v. Progressive Northern Ins. Co.*, 785 A.2d 281, 287 (Del. 2001) ("Delaware courts have consistently held that an interpretation that gives effect to each term of an agreement is preferable to any interpretation that would result in a conclusion that some terms are uselessly repetitive. Contracts are to be interpreted in a way that does not render any provisions 'illusory or meaningless.'") (footnote omitted).

entitle Medicare to receive "reimbursement" payments from the Claims Administrator in connection with class members for whom Medicare never paid any medical expenses.  The "Response List" that CMMS is required to provide to the Claims Administrator, listing class members who are "Medicare beneficiaries," must identify persons who received medicare benefits for revision surgery, not simply persons who are enrolled in Medicare.

## IV.    Conclusion.

The Master Settlement Agreement in this MDL between the Plaintiff Class and Sulzer provided that this Court "retain[s] exclusive and continuing jurisdiction . . . over this Settlement Agreement with respect to the performance of the terms and conditions of the Settlement Agreement, to assure that all disbursements are properly made in accordance with the terms of the Settlement Agreement, and to interpret and enforce the terms, conditions and obligations of this Settlement Agreement."[11]  In addition, in the Knee Implant Agreement, CMMS "waive[d] any objections and agree[d] to submit to the jurisdiction of the United States District Court for the Northern District of Ohio to resolve any and all disputes arising in connection with this Settlement Agreement." Accordingly, it is clear the undersigned is empowered to resolve the dispute raised in the Claims

---

[11]  MSA §9.1 (master docket no. 361).

Administrator's motion.[12]

Having concluded the Claims Administrator's interpretation of the Knee Implant Agreement is correct, the Court now declares as follows:

1.    The Knee Implant Agreement provides: "Within 60 days of receipt of the list of Subject Class Members, [CMMS] shall provide to Claims Administrator, in a format substantially similar to the format in the Claims Administrator's data production described above, a list ("Response List") of those Subject Class Members who are Medicare beneficiaries."

2.    Medicare has not timely met its obligation to provide a "Response List" to the Claims Administrator containing the required information.

3.    Accordingly, CMMS shall, within 30 days of the date of this Order, provide to the Claims Administrator a Response List identifying which of the Subject Class Members earlier identified by the Claims Administrator are Medicare beneficiaries who received some Medicare benefits related to their Sulzer knee implant revision surgery.

4.    If CMMS does not timely provide the required Response List, then the Claims Administrator's obligations pursuant to the Knee Implant Agreement shall be deemed fulfilled and satisfied.

---

[12] The Court notes that, at least in the context this dispute is presented, the Tucker Act, 28 U.S.C. §1491 *et seq*, does not apply to vest exclusive jurisdiction over the matter with the Federal Court of Claims. With his motion, the Claims Administrator seeks only declaratory relief regarding his obligations under the Knee Implant Agreement. He does not seek money damages. *See Chevron U.S.A. v. United States*, 71 Fed. Cl. 236, 256 (2006) ("[I]n order to pursue a substantive right, plaintiffs must identify and plead an independent contractual relationship, constitutional provision, federal statute, and/or executive agency regulation that provides a substantive right to money damages for the court to have jurisdiction."); *cf. Sims v. Johnson*, 505 F.3d 1301, 378 (D.C. Ct. App. 2007) (holding the Federal Court of Claims did not have exclusive jurisdiction over plaintiff's motion for declaratory judgment regarding the government's obligation to pay attorney fees pursuant to a settlement agreement, because the plaintiff's motion did not assert a breach of contract claim against the government).

The Claims Administrator or the Court may, however, extend the time within which CMMS must provide the required Response List.

5.     Upon receipt of the required Response List, the Claims Administrator shall execute its obligations as required by the Knee Implant Agreement, including making payments to CMMS.

Finally, in light of CMMS's failure to file with the Court any response to the Claims Administrator's motion, the Court directs the Claims Administrator to furnish promptly a copy of this Order to persons at CMMS with whom he has been dealing.

**IT IS SO ORDERED.**

/s/ Kathleen M. O'Malley
**KATHLEEN McDONALD O'MALLEY**[*]

**DATED**: January 13, 2011

---

[*] *United States Circuit Judge for the United States Court of Appeals for the Federal Circuit, sitting by designation.*